# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS
## CENTRAL DIVISION

| | |
|---|---|
| **DAVID AUSTIN**, individually, and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>**KEN'S FOODS, INC.,**<br><br>        Defendant. | CIVIL ACTION<br><br>Case No.: 4:24-cv-40040-MRG<br><br><br>**REQUEST FOR ORAL ARGUMENT** |

## <u>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S PRE-DISCOVERY MOTION FOR CONDITIONAL CERTIFICATION AND COURT-AUTHORIZED OTICE PURSUANT TO 29 U.S.C. § 216(b)</u>

## <u>TABLE OF CONTENTS</u>

Index of Authorities .................................................................................................. iii

I.    Introduction ..................................................................................................... 1

II.   Relevant Facts ................................................................................................. 2

    A. Parties and the Putative Collective .............................................................. 2

       1. Defendant ............................................................................................... 2

       2. The Named Plaintiff and the Putative FLSA Collective ......................... 3

    B. All of Defendant's Houly Employees Were Subejcted to Similar Unlawful
      Policies and Practices and Were Instructed to Work Off-the-Clock ........................... 5

    C. Defendant Maintained an Unlawful Policy and Practice of Failing to Pay
      its Hourly Employees for Necessay Pre- and Post-Shift Work Overtime ................. 6

    D. Defendant's FLSA Violations Are Widespread and Affected All Hourly
      Employees .................................................................................................... 9

III.  Law and Argument ......................................................................................... 10

    A. The FLSA Authorizes Collective Actions and Notice to Similarly Situated
      Employees .................................................................................................. 10

    B. Courts in the First Circuit Consistently Apporve the Use of the "Fairly
      Lenient Standard" When Authorizing Notice to Employees ................................... 11

       1. Stage One: Conditional Certification .................................................... 11

          a. Plaintiff Bears a Light Burden of Proof ........................................ 12

          b. Evidence Typically Accepted to Meet the "Similarly Situated"
           Standard ........................................................................................ 13

          c. At the Notice Stage, Courts Do Not Evaluate the Merits, Make
           Credibility Determinations or Consider Individual Defenses ....................... 15

       2. Early Notice Is Imperative to Protected Employees' Statutes of
         Limitations ......................................................................................... 16

       3. Stage Two: The Certification/Decertification Stage ............................. 17

C.   Plaintiffs' Proposed Notice Should be Approved .......................................... 18

D.   Notice Should be Sent by Mail, Email, and Text ......................................... 18

E.   This Court Should Grant a Sixty (60) Day Opt-On Period for Additional
     Plaintiffs to Join This Litigation And for Reminder Notice to Be Issued
     to Those Who Have Not Yet Responded ................................................. 19

IV.   Conclusion ........................................................................................ 20

## INDEX OF AUTHORITITES

*Atkinson v. TeleTech Holdings, Inc.*,
   2015 WL 853234 (S.D. Ohio Feb. 26, 2015) .................................................................. 19
*Beattie v. TTEC Healthcare Sols., Inc.*,
   2019 WL 2866559 (D. Colo. July 3, 2019) ............................................................ 18, 19
*Bhumithanarn v. 22 Noodle Market Corp.*,
   2015 WL 4240985 (S.D.N.Y. July 13, 2015) ............................................................... 19
*Burns v. City of Holyoke*,
   881 F. Supp. 2d 232 (D. Mass. 2012) .................................................................... 12, 17
*Cunha v. Avis Budget Car Rental, LLC*,
   221 F. Supp. 3d 178 (D. Mass. 2016) ............................................................. 13, 14, 15
*Davis v. Footbridge Eng'g Servs., LLC*,
   2010 U.S. Dist. LEXIS 106523 (D. Mass. Oct. 5, 2010) .......................................... 14
*Fisher v. Michigan Bell Telephone Co.*,
   665 F. Supp. 2d 819 (E.D. Mich. 2009) ...................................................................... 11
*Frykenberg v. Captain George's of South Carolina, LP*,
   2020 WL 5757678 (D.S.C. Sept. 28, 2020) ................................................................ 18
*Gardner v. Fallon Health & Life Ins. Co., Inc.*,
   2021 WL 4459525 (D. Mass. Sept. 29, 2021) ...................................................... 18, 19
*Garner v. G.D. Searle Pharm. & Co.*,
   802 F. Supp. 418 (M.D. Ala. 1991) ............................................................................ 13
*Hoffman v. Sbarro, Inc.*,
   982 F. Supp. 249 (S.D.N.Y. 1997) .............................................................................. 10
*Hoffman-La Roche v. Sperling*,
   493 U.S. 165 (1989) ........................................................................................ 1, 10, 11
*IBP v. Alvarez*,
   546 U.S. 21 (2005) ...................................................................................................... 5, 6
*Ivery v. RMH Fran. Corp.*,
   280 F. Supp. 3d 1121 (N.D. Ill. 2017) ........................................................................ 18
*Jackson v. New York Tel. Co.*,
   163 F.R.D. 429 (S.D.N.Y. 1995) ........................................................................... 11, 12
*Kane v. Gage Merch. Servs., Inc.*,
   138 F. Supp. 2d 212 (D. Mass. 2001) ....................................................... 11, 12, 13, 14
*Keller-Brittle v. Collecto Inc.*,
   2018 WL 6199568 (D. Mass. Nov. 28, 2018) ............................................................ 16
*Litz v. Saint Consulting Grp., Inc.*,
   2012 WL 549057 (D. Mass. Feb. 17, 2012) ............................................................... 14
*Lusardi v. Xerox Copy*,
   118 F.R.D. 351 (D.N.J. 1987) ..................................................................................... 11
*Mooney v. Aramco Servs. Co*,
   54 F.3d 1207 (5th Cir. 1995) ...................................................................................... 10
*Noll v. Flowers Food, Inc.*,
   2017 WL 11516828 (D. Mass. Jan. 20, 2017) ........................................................... 19
*O'Donnell v. Robert Half Int'l, Inc.*,
   429 F.Supp.2d 246 (D. Mass. 2006) ........................................................................... 12

*Pearl v. Clearlink Partners, LLC*,
    546 F. Supp. 3d 32 (D. Mass. 2021)..................................................Passim
*Pogue v Chisholm Energy Operating, LLC*,
    2021 WL 5861184 (D.N.M. Dec.10, 2021)................................................. 19
*Poreda v. Boise Cascade, L.L.C.*,
    532 F. Supp. 2d 234 (D. Mass. 2008)........................................ 12, 13, 15
*Prescott v. Prudential Ins. Co.*,
    729 F.Supp.2d 357 (D. Me. 2010) .......................................................... 16
*Roberts v. TJX Companies, Inc.*,
    2017 WL 1217114 (D. Mass. Mar. 31, 2017) .......................................... 16
*Robertson v. REP Processing, LLC*,
    2021 WL 4255027 (D. Colo. Sept. 16, 2021)........................................... 19
*Romero v. Clean Harbors Surface Rentals USA, Inc.*,
    368 F. Supp. 3d 152 (D. Mass.)............................................................... 18
*Sperling v. Hoffman-LaRoche, Inc.*,
    118 F.R.D. 392 (D.N.J. 1988) .................................................................. 17
*Torrezani v. VIP Auto Detailing, Inc.*,
    318 F.R.D. 548 (D. Mass. 2017) .......................................................Passim
*Torrezani v. VIP Auto Detailing, Inc.*,
    2017 WL 2951618 (D. Mass. May 31, 2017)............................................ 19
*Trezvant v. Fidelity Employer Servs. Corp.*,
    434 F.Supp.2d 40 (D. Mass. 2006)....................................................Passim
*Williams v. Sykes, et al.*,
    No. 13-cv-946 (D. Minn. 2013) ............................................................... 18
*Wise v. Patriot Resorts Corp.*,
    2006 WL 6110885 (D. Mass. Feb. 15, 2006) .......................................... 12

Statutes

29 U.S.C. § 207(a) ........................................................................................ 10
29 U.S.C. § 216(b)....................................................................................Passim
29 U.S.C. § 256(b)......................................................................................... 16
Section 216.................................................................................................... 11

iv

## I.  <u>INTRODUCTION</u>

Plaintiff, David Austin, and opt-in Plaintiffs Melody Akins, Daniel Benton, Jermicheal Berry, Selena Blocker, Larnelle Bocot, Benita Bramlett, John Bryant, Edward Cabral, Betty Deal, Davion Hite, Damon Hudson, Leslie Jenkins, Zedrick Johnson, Titania Jones, Sherrie Middlebrooks, Seth Miller, Elia Regalado, Vickey Reynolds, Oralia Samaniego, Jazmine Sanchez, and Bruce Showers (hereinafter, "Plaintiffs"), individually and on behalf of all others similarly situated, filed this lawsuit against Ken's Foods, Inc. ("Defendant"), challenging its willful violations of the Fair Labor Standards Act ("FLSA"). More specifically, Plaintiffs allege that Defendant willfully violated the FLSA by knowingly suffering or permitting Plaintiffs and all others similarly situated to perform unpaid work before and after their scheduled shifts, thereby failing to pay these employees federally mandated overtime compensation.

Pursuant to 29 U.S.C. § 216(b), Plaintiffs seek conditional certification of their FLSA claims on behalf of the following employee collective:

> *All current and former hourly employees who worked for Ken's Foods, Inc. at any of its manufacturing facilities during the last three years* (the "FLSA Collective").

Congress and the Supreme Court explicitly authorized employees to pursue FLSA claims on a collective basis through the opt-in procedure set forth in 29 U.S.C § 216(b). *See Hoffman-La Roche v. Sperling*, 493 U.S. 165, 170 (1989) ("A collective action allows … plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources. The judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged ... activity"). In accordance with these public policies, Plaintiffs hereby move for an order: (1) conditionally certifying the proposed FLSA Collective; (2) requiring Defendant to identify all putative collective members by providing a list of their names, last known addresses, dates and location of employment, phone numbers, and email addresses in electronic

and importable format within ten (10) days of the entry of the order; (3) permitting Court-authorized notice of this action (*see* **Exhibits A** and **B**, Proposed Notice and Consent Forms and Text Message Notice) to be sent via U.S. Mail, e-mail, and text message; (4) appointing the undersigned as counsel for the FLSA Collective; and (5) giving members of the FLSA Collective sixty (60) days to join this case, measured from the date the Court-approved Notice is sent, with one reminder email sent thirty (30) days thereafter to anyone who did not respond.

## II.    RELEVANT FACTS

### A.    Parties and the Putative Collective

#### 1. *Defendant*

Defendant is a "leading manufacturer of salad dressings and sauces, as well as mayonnaise and barbeque sauces."[1] Defendant offers a wide range of products, including over 1,000 varieties of dressing and sauces.[2] Defendant's business operations are maintained through manufacturing facilities in Marlborough, Massachusetts; Las Vegas, Nevada; McDonough, Georgia; and Lebanon, Indiana.[3] To facilitate its operations, Defendant employs and employed workers as hourly (i.e., non-exempt) employees with a number of job titles including, but not limited to: Forklift Operators, Machine Operators, Batch Processing Operators, Processing Supervisors, Mechanics, Sanitation employees, Team Leaders, Distribution employees, Packaging Operators, Maintenance Planners, Maintenance Supervisors, Maintenance Technicians, Maintenance Foremen, Kitchen Mixers, Quality Control Technicians, Quality Assurance employees, Material Handlers, Safety Managers, Packaging Line Engineers, Production employees, and Production

---

[1] https://jobs.kensfoods.com/our-locations/ (last visited February 27, 2024).
[2] https://jobs.kensfoods.com/who-we-are/ (last visited February 27, 2024).
[3] https://jobs.kensfoods.com/our-locations/ (last visited February 27, 2024).

Supervisors[4] (collectively referred to herein as "Hourly Employees"). (ECF No. 1, Plaintiff's Complaint, ¶¶ 3-4, 14; **Ex. C**, David Austin Declaration, ¶ 5; **Ex. D**, John Bryant Declaration, ¶ 5; **Ex. E**, Edward Cabral Declaration, ¶ 5; **Ex. F**, Elia Regalado Declaration, ¶ 5; **Ex. G**, Betty Deal Declaration, ¶ 5; **Ex. H**, Melody Akins Declaration, ¶ 5; **Ex. I**, Damon Hudson Declaration, ¶ 5; **Ex. J**, Leslie Jenkins Declaration, ¶ 5; **Ex. K**, Titania Jones Declaration, ¶ 5; **Ex. L**, Ken's Foods Job Descriptions). Defendant has employed hundreds of Hourly Employees, including Plaintiffs, within the past three years. (ECF No. 1, ¶¶ 3, 119, 121, 130; **Exs. C - K**, ¶ 4).

## 2. *The Named Plaintiff and the Putative FLSA Collective*

Plaintiff David Austin has worked for Defendant as an Hourly Employee at Defendant's Marlborough, Massachusetts manufacturing facility since October 2011, and is paid an hourly wage of $38.00. (ECF No. 1, ¶ 28; **Ex. C, ¶¶ 2, 6**). Opt-in Plaintiff John Byrant worked for Defendant as an Hourly Employee at Defendant's Marlborough, Massachusetts facility from August 13, 2018 to September 18, 2023 and was paid an hourly wage of $25. (**Ex. D, ¶¶** 2, 6). Opt-in Plaintiff Edward Cabral worked for Defendant as an Hourly Employee at Defendant's Marlborough, Massachusetts facility from April 2018 to August 2021 and was paid an hourly wage of $18. (**Ex. E, ¶¶** 2, 6). Opt-in Plaintiff Elia Regalado worked for Defendant as an Hourly Employee at Defendant's Marlborough, Massachusetts facility from January 10, 2022 to November 16, 2022 and was paid an hourly wage of $22. (**Ex. F, ¶¶** 2, 6).

Opt-in Plaintiff Betty Deal worked for Defendant as an Hourly Employee at Defendant's Las Vegas, Neveda facility from September 26, 2022 to September 14, 2023 and was paid an hourly wage of $23.50. (**Ex. G, ¶¶** 2, 6).

---

[4] https://jobs.kensfoods.com/;  https://jobs.kensfoods.com/jobs/ (last visited June 25, 2024).

Opt-in Plaintiff Melody Akins worked for Defendant as an Hourly Employee at Defendant's McDonough, Georgia facility from February 2024 to March 2021 and was paid an hourly wage of $20. (**Ex. H, ¶¶ 2, 6**). Opt-in Plaintiff Damon Hudson worked for Defendant as an Hourly Employee at Defendant's McDonough, Georgia facility from March 2004 through June 2023 and was paid an hourly wage of $22.50. (**Ex. I, ¶¶ 2, 6**). Opt-in Plaintiff Leslie Jenkins has worked for Defendant as an Hourly Employee at Defendant's McDonough, Georgia facility since November 2023 and is paid an hourly wage of $26. (**Ex. J, ¶¶ 2, 6**). Opt-in Plaintiff Titania Jones worked for Defendant as an Hourly Employee at Defendant's McDonough, Georgia facility from March 2004 until March 2020. (**Ex. K, ¶ 2**). In May 2021, Opt-in Plaintiff Jones returned to Ken's Foods, and is presently employed as an hourly employee at Ken's Foods McDonough, Georgia manufacturing facility. *Id*. Plaintiff Titania Jones is paid an hourly wage of $28. (**Ex. K, ¶ 6**).

As Hourly Employees, Plaintiff and those similarly situated typically worked four to five days per week and regularly worked more than forty (40) hours in a week. (*See* ECF No. 1 at ¶ 28; *see also* **Exs. C – K, ¶ 6**). Hourly Employees were responsible for, among other things, facilitating manufacturing and production operations across Defendant's manufacturing facilities. (*See generally*, **Ex. L**; *see also* ECF No. 1 at ¶¶ 14, 32-34; **Exs. C – K, ¶¶ 4-5**).

Defendant's unlawful pay policies and timekeeping practices, as well as the nature of Plaintiffs' job duties as Hourly Employees, were substantially the same across facilities and amongst the putative Collective. (ECF No. 1, ¶¶ 101-107; *see generally* **Exs. C – K**; **Ex. L**). Plaintiffs and all Hourly Employees are similarly situated because (a) they have been or are employed in the same or similar positions; (b) they were or are performing the same or similar job duties; (c) they were or are subject to the same or similar unlawful practices, policy, or plan; and (d) their claims are based upon the same factual and legal theories. *Id*.

**B.** **All of Defendant's Hourly Employees Were Subjected to Similar Unlawful Policies and Practices and Were Instructed to Work Off-the-Clock**

Defendant maintained a common policy and practice of depriving its Hourly Employees of pay for all hours worked. (ECF No. 1, ¶¶ 101 - 107; *see generally* **Exs. C – K**). Defendant's policy and practice was achieved through, among other means, strict adherence to company policies to pressure Hourly Employees into arriving early and working off-the-clock so they can be dressed in PPE at the start of their shifts, pressure to work substantial amounts of uncompensated, off-the-clock time as part of their job duties, and the timekeeping application Defendant required its Hourly Employees to use. (*See* ECF No. 1 at ¶¶ 5-7, 10, 35-60; **Exs. C – K**, ¶¶ 7-9, 11-14, 21-28). Because Defendant required its Hourly Employees to perform pre- and post-shift work off-the-clock, the hours tracked in Defendant's timekeeping system were inaccurate representations of the total amount of time Hourly Employees spent working. *Id*. Thus, the hours reflected on the Hourly Employees' paystubs were also inaccurate representations of their hours worked. *Id*.

The Department of Labor ("DOL") recognizes that the time that an employee is required to spend putting on and taking off PPE, "no matter how minimal … on the employer's premises is compensable 'work' under the FLSA." Wage & Hour Adv. Mem. No. 2006-2 (May 31, 2006), available at *https://www.dol.gov/whd/FieldBulletins/AdvisoryMemo2006_2.htm#_ftnref2*. In an advisory memorandum regarding the Supreme Court's decision in *IBP v. Alvarez*, 546 U.S. 21 (2005), the DOL reiterated its view that the FLSA requires compensation for donning and doffing safety gear when the donning and doffing activities must be performed at work. The DOL opined:

> Therefore, the time, no matter how minimal, that an employee is required to spend putting on and taking off gear on the employer's premises is compensable 'work' under the FLSA. … However, donning and doffing of required gear is within the continuous workday only when the employer or the nature of the job mandates that it take place on the employer's premises.

*Id*. The FLSA also requires "[a] daily and weekly record of all hours worked, including time spent

in pre-shift and post-shift job-related activities [] be kept." *Id.*

C. <u>**Defendant Maintained an Unlawful Policy and Practice of Failing to Pay its Hourly Employees for Necessary Pre- and Post-Shift Work**</u>

Defendant required all Hourly Employees, including Plaintiffs, to wear company-issued uniforms, protective clothing, and safety gear during work shifts. (ECF No. 1 at ¶¶ 36-53; **Exs. C – K**, ¶¶ 7-25). The company-issued protective clothing and safety gear included button up pants, a long sleeve shirt with snaps down the middle, safety shoes, a hard hat, a coat and/or jacket, beard and hair nets, earplugs, and safety glasses[5] (hereinafter, "personal protective equipment" or "PPE"). (*Id.*). Defendant required Plaintiff and all Hourly Employees to don the PPE before work shifts in designated locations at Defendant's manufacturing facilities. (*Id.*). Before Hourly Employees' scheduled shifts and before beginning manufacturing and production activities, Hourly Employees were required to undertake the following essential work tasks in chronological order[6]:

- Upon arriving at their respective facility, Hourly Employees were required to "badge-in" to the facility, swiping their security badges at the employee entrance before walking inside the building;

- Hourly Employees next walked up two flights of stairs to a break room to drop off their lunches. Once the employees dropped their lunches in the break room, they proceeded to the locker room;

- After entering the locker room, Hourly Employees retrieved their company-issued, freshly-

---

[5] The exact required PPE may vary slightly from department to department and facility to facility, however, the PPE required was either the same or substantially similar across all departments and facilities. All of Defendant's Hourly Employees across departments and facilities were required to wear an array of PPE, including company-issued pants, shirts, safety shoes, hard hats, coats and/or jackets, beard and hair nets, earplugs, and safety glasses.

[6] The exact required pre-shift PPE donning process may vary slightly from department to department and facility to facility, however, the pre-shift PPE donning process required was either the same or substantially similar across all departments and facilities. (*See* **Exs. C – K**).

laundered uniforms from their uniform lockers.[7]  Defendant laundered and deposited 2-7 uniforms into each Hourly Employee's uniform locker each week. Once employees retrieved their day's uniform from their uniform locker, they proceeded towards their personal locker, which was in a separate area of the locker room;

- Once Hourly Employees arrived at their personal lockers, Hourly Employees unlocked their combination locks on their personal lockers.  Hourly Employees then removed their shoes, stowed their personal items in their lockers, and put on their company-issued work shirts and work pants.

- Hourly Employees kept their company-issued safety shoes, hard hats, and coats/jackets inside their personal lockers. After lacing up their company-issued safety shoes, putting on their hard hats and coats/jackets, Hourly Employees locked the combination locks on their personal lockers and proceeded to walk down two flights of stairs and down a long hallway to the facility's production floor;

- Once on the production floor, Hourly Employees were required to retrieve and don their company-issued beard and hair nets, earplugs, and safety glasses;

- Following donning all of their PPE, Hourly Employees were required to engage in a handwashing routine at the handwash station on the production floor;

- Once this process was completed, Hourly Employees traversed the facility to their respective work areas.

(ECF No. 1 at ¶ 49; **Exs. C – K**, ¶ 11). This pre-shift process took Hourly Employees substantial time on a daily basis, ranging from 10 to 12 minutes each shift. (ECF No. 1 at ¶ 50; **Exs. C – K**, ¶ 12).

Similarly, after their scheduled shifts, Hourly Employees were required to undertake the following essential work tasks in chronological order[8]:

---

[7] Hourly Employees at Defendant's McDonough, Georgia facility were permitted to bring their uniforms home with them, and would occasionally launder their uniforms themselves. (*See* **Exs. H – K**). On the times Georgia Hourly Employees laundered their uniforms at home, some employees would arrive at work wearing all, or part, of the uniform, and other times would carry my uniform with them, and don-and-doff in the exact process as described above. *Id*. Often times, Hourly Employees would arrive at work wearing half the uniform (for example, wearing the uniform work shirt and carrying the uniform pants), and would don-and-doff in the same manner as necessary. *Id*.

[8] The exact required post-shift PPE doffing process may vary slightly from department to department and facility to facility, however, the post-shift PPE doffing process required was either the same or substantially similar across all departments and facilities. (*See* **Exs. C – K**).

- At the end of their scheduled shifts, Hourly Employees walked from their respective workstations towards the timeclocks located just off the production floor. Hourly Employees punched out using their workplace badges and walked to the employee locker rooms.

- After entering the locker rooms, Hourly Employees threw their beard and hair nets in the trash.  Hourly Employees next changed out of their required uniforms and placed them in either a laundry basket or a laundry closet.[9] Hourly Employees also removed their safety shoes, safety glasses, coats/jackets, and hard hats, and carried those items with them to their personal lockers. Once Hourly Employees removed their uniforms, they proceeded towards their personal lockers, which were in a separate area of the locker room.

- Once Hourly Employees arrived at their personal lockers, Hourly Employees unlocked their combination locks on their personal lockers. Hourly Employees then removed their company-issued safety shoes, stowed their safety shoes, safety glasses, and hard hats in their personal lockers, and put on their street clothes.

- Hourly Employees next locked the combination locks on their personal lockers and proceeded to walk down two flights of stairs and down a long hallway which brought Hourly Employees to a door which led to each facility's parking lot;

- Finally, Hourly Employees would leave the facility.

The post-shift doffing and walking process took Hourly Employees substantial time on a daily basis, ranging from 10 to 12 minutes per shift, and occurred after the end of their scheduled shift. (ECF No. 1 at ¶ 54; **Exs. C – K**, ¶ 14). At Defendant's Massachusetts, Georgia, and Neveda facilities, Defendant prohibited Hourly Employees from donning or doffing the PPE at home, taking the PPE home, or otherwise removing the PPE from Defendant's manufacturing facilities, (ECF No. 1 at ¶¶ 38-39; **Exs. C – G**, ¶¶ 15-16), and Defendant otherwise required all Hourly

---

[9] Hourly Employees at Defendant's McDonough, Georgia facility were permitted to bring their uniforms home with them, and would occasionally launder their uniforms themselves. (*See* **Exs. H – K**). On the times Georgia Hourly Employees laundered their uniforms at home, some employees would leave work wearing all, or part, of the uniform, and other times would change and carry their uniform with them, and don-and-doff in the exact process as described above. *Id*. Often times, Hourly Employees would leave work wearing half the uniform (for example, wearing the uniform work shirt and carrying the uniform pants), and would don-and-doff in the same manner as necessary. *Id*.

Employees at each of Defendant's facilities to wear the PPE at all times upon arrival at a manufacturing facility. (ECF No. 1 at ¶¶ 37-44; **Exs. C – K**, ¶¶ 16-19).

Hourly Employees were not compensated for the above-described pre- and post-shift donning and doffing time because Defendant only paid Hourly Employees based upon their scheduled shift times. (ECF No. 1 at ¶¶ 11, 47, 51, 54; **Exs. C – K**, ¶¶ 21-27). Due to the extensive PPE donning and walking process, Hourly Employees spent 10 to 12 minutes per day prior to their scheduled shift start time on PPE donning and walking activities in order to be at their work station at the beginning of their shift. (ECF No. 1 at ¶¶ 51-52; **Exs. C – K**, ¶¶ 23-24). Similarly, due to the extensive PPE doffing and walking process, Hourly Employees spent 10 to 12 minutes per day after their scheduled shift end times on PPE doffing and walking activities. (ECF No. 1 at ¶¶ 54-56; **Exs. C – K**, ¶¶ 25-26). This time spent donning and doffing before and after their shifts was compensable because it was an integral and indispensable part of the Hourly Employees work, and they could not perform their required job duties without the PPE. (ECF No. 1, ¶¶ 61-62).

### D.  Defendant's FLSA Violations Are Widespread and Affected All Hourly Employees

Plaintiffs and all Hourly Employees worked for Defendant and were subject to the same unlawful pay practices, as outlined herein. Plaintiffs and the FLSA Collective did not receive compensation for the essential pre- and post-shift work duties described herein, were not compensated for all hours worked, where applicable, and were denied overtime wages at the rate of time-and-a-half for time worked in excess of forty (40) hours per week. (*See generally*, **Exs. C – K**, Plaintiffs' Declarations).

Defendant's off-the-clock work requirements and overtime compensation deficiencies were common pay practices applicable to every Hourly Employee, and the sworn declarations provided by Plaintiffs, across Defendant's facilities, provides *prima facie* evidence that Court-

authorized notice is warranted. In light of the multitude of violations articulated above, and the evidence submitted herewith, Plaintiffs satisfy the lenient burden applicable to pre-discovery conditional certification motions in this Circuit.

## III.    LAW AND ARGUMENT

### A.    The FLSA Authorizes Collective Actions and Notice to Similarly Situated Employees

The FLSA requires employers to pay employees overtime compensation at 1.5 times the regular rates at which they are employed for hours worked in excess of forty (40) hours in a week. 29 U.S.C. § 207(a). An employer who violates this requirement can be sued by the affected employees collectively. 29 U.S.C. § 216(b). In order to participate in such a collective action, each aggrieved employee must file a written consent. *Id.* Until an employee files such a consent, the statute of limitations on his or her FLSA claim continues to run. *Id.*

The FLSA is silent on whether or how other similarly situated persons should be notified of the pendency of a collective action so that they might "opt in." In *Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 173 (1989), the Supreme Court held that courts have discretion to implement the collective action procedure by facilitating notice to potential class members.[10] Commenting favorably upon collective actions, the Court noted:

> A collective action allows … plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources. The judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged … activity. These benefits, however, depend on employees receiving accurate and timely notice concerning the pendency of the collective action, so that they can make informed decisions about whether to participate.

---

[10] Although *Hoffman-LaRoche* is an Age Discrimination in Employment Act (ADEA) case, its analysis is applicable to FLSA cases because the ADEA incorporates the FLSA collective action provisions. *Mooney v. Aramco Servs. Co*, 54 F.3d 1207, 1212 (5th Cir. 1995); *Hoffman v. Sbarro, Inc.*, 982 F. Supp. 249, 261 n.15 (S.D.N.Y. 1997) ("[I]n *Hoffman-LaRoche*, the Supreme Court construed § 216(b) on its own terms, and its analysis applies with equal force to FLSA cases.").

*Id.* at 170. Conversely, failure to provide prompt notice frustrates the FLSA's broad remedial purposes and its specific grant of collective action rights to employees. *See Fisher v. Michigan Bell Telephone Co.*, 665 F. Supp. 2d 819, 828-29 (E.D. Mich. 2009); *Jackson v. New York Tel. Co.*, 163 F.R.D. 429, 431 (S.D.N.Y. 1995).

    **B.**   **Courts in the First Circuit Consistently Approve the Use of the "Fairly Lenient Standard" When Authorizing Notice to Employees**

Federal courts, including those in the First Circuit, typically follow the "two-stage class certification" process set forth in *Lusardi v. Xerox Copy*, 118 F.R.D. 351 (D.N.J. 1987) for determining whether all plaintiffs are similarly situated. "[T]he majority of courts addressing this issue in the First Circuit have adopted the two-tier approach" for "determining whether potential plaintiffs are similarly situated for certification of the Section 216 'opt-in' representative action" pursuant to 29 U.S.C. § 216(b). *Trezvant v. Fidelity Employer Servs. Corp.,* 434 F.Supp.2d 40, 43 (D. Mass. 2006) (citing *Kane v. Gage Merch. Servs., Inc.*, 138 F. Supp. 2d 212, 214 (D. Mass. 2001). Under the two-tier approach, "the court makes an initial determination of whether the potential class should receive notice of the pending action and then, later, after discovery is complete, the court makes a final 'similarly situated' determination." *Trezvant*, 434 F.Supp. at 43; *Kane*, 138 F. Supp. 2d at 214.

### *1. Stage One: Conditional Certification*

The first "notice" stage, often takes place before discovery and its purpose is to provide notice to potential plaintiffs and the opportunity to opt into the pending case. *See Kane*, 138 F. Supp. 2d at 214; *Torrezani v. VIP Auto Detailing, Inc.,* 318 F.R.D. 548, 557 (D. Mass. 2017) (discussing how conditional certification is generally determined before the discovery period).

### a.  *Plaintiff Bears a Light Burden of Proof*

Because the conditional certification decision is generally made prior to discovery, the plaintiff's evidentiary burden is "fairly lenient" and "typically results in conditional certification of the representative class." *Trezvant,* 434 F.Supp.2d at 43 (quoting *Kane*, 138 F.Supp.2d at 214).

At this stage, this Court simply makes "a preliminary inquiry as to whether a manageable class exists and require[s] plaintiffs to make a preliminary factual showing that there actually exists a similarly situated group of potential plaintiffs." *Trezvant,* 434 F.Supp.2d at 43-44). The meaning of "similarly situated" is not defined in the FLSA, and but this Court has given general guidance that the party moving for conditional certification must preliminarily provide "some evidence that the legal claims and factual characteristics of the class in [the] case are similar." *Burns v. City of Holyoke*, 881 F. Supp. 2d 232, 235 (D. Mass. 2012) (quoting *Trezvant,* 434 F.Supp.2d at 44).

There are countless examples of district courts in this Circuit (including this Court) applying the fairly lenient standard. *See Poreda v. Boise Cascade, L.L.C.*, 532 F. Supp. 2d 234, 238 (D. Mass. 2008); *Pearl v. Clearlink Partners, LLC*, 546 F. Supp. 3d 32, 35 (D. Mass. 2021); *O'Donnell v. Robert Half Int'l, Inc.,* 429 F.Supp.2d 246, 249 (D. Mass. 2006) (applying "a 'two-tiered' approach to determining whether named plaintiffs and putative class members are similarly situated"); *Wise v. Patriot Resorts Corp.,* 2006 WL 6110885, at *1 (D. Mass. Feb. 15, 2006) (using the "two-step process").

A lower evidentiary burden at this stage serves the FLSA's remedial purpose and court holdings that the § 216(b) similarly situated requirement must be interpreted generously to permit workers to collectively pursue their FLSA claims. *See e.g., Trezvant,* 434 F.Supp.2d at 43 ("As a result of the minimal evidence available," the fairly lenient standard "typically results in conditional certification of the representative class,"); *Jackson v. New York Tel. Co*., 163 F.R.D.

429, 431 (S.D.N.Y. 1995) (imposition of a rigorous inquiry would undermine "the importance of early judicial management to assure efficient resolution of similar claims."); *Garner v. G.D. Searle Pharm. & Co.*, 802 F. Supp. 418, 422 (M.D. Ala. 1991) (rigorous inquiry into § 216(b)'s similarly situated requirement "would unnecessarily hinder the development of collective actions and would undermine the 'broad remedial goals' of the antidiscrimination provisions of the FLSA.").

The focus of the Court's inquiry at this stage is not on whether there has been an actual violation of law, but on whether the proposed plaintiffs are similarly situated with respect to their *allegations* that the law has been violated. *See, e.g.*, *Pearl*, 546 F. Supp. 3d at 35 (quoting *Kane*, 138 F.Supp.2d at 214) ("[A]t the 'notice stage', the Court relies upon the initial pleadings and affidavits to determine, under a 'fairly lenient standard', whether the putative class members 'were subject to a single decision, policy, or plan that violated the law.'"); *Poreda*, 532 F. Supp. 2d at 238 (quoting *Trezvant,* 434 F.Supp.2d at 43) (Standard met "by making a modest factual showing or asserting *substantial* allegations that 'the putative class members were together the victims of a single decision, policy, or plan that violated the law.'"). The Court generally makes its decision based on the initial pleadings and any submitted affidavits. *Pearl*, 546 F. Supp. 3d at 35.

This motion was filed pre-discovery. Accordingly, this matter is currently at the "notice stage" and the lenient burden of proof applies.

### b. *Evidence Typically Accepted to Meet the "Similarly Situated" Standard*

At the "notice" stage, plaintiffs may show *either*: (1) that their job positions and duties are similar to those positions held by the putative class members, *see Cunha v. Avis Budget Car Rental, LLC*, 221 F. Supp. 3d 178, 182 (D. Mass. 2016) (plaintiff's allegations and supporting evidence that employees' "job duties and responsibilities appear to remain the same," coupled with same job description across putative collective class "is sufficient to satisfy the minimal showing

necessary to justify issuing notice"); *Litz v. Saint Consulting Grp., Inc.,* 2012 WL 549057, at *2 (D. Mass. Feb. 17, 2012) (allowing conditional certification where employees had the same general job descriptions, duties, and terms of employment); or (2) that plaintiffs and the putative class members were all subject to the same unified policy, plan, or scheme that forms the basis of the alleged FLSA violation, *see, e.g., Trezvant,* 434 F.Supp.2d at 43 (A plaintiff can meet this standard "by making a modest factual showing or asserting *substantial* allegations that 'the putative class members were together the victims of a single decision, policy, or plan that violated the law'"); *Davis v. Footbridge Eng'g Servs., LLC*, 2010 U.S. Dist. LEXIS 106523, at *2 (D. Mass. Oct. 5, 2010) (plaintiff "adequately alleged that she and her potential class members performed similar functions and were subject to similar policies"); *Kane,* 138 F.Supp.2d at 215 (same); *Pearl*, 546 F. Supp. 3d at 36 ("all putative class members were subjected to a common, unwritten policy … that denied them overtime compensation"). Plaintiffs are not required to show that they hold identical positions. *Cunha*, 221 F. Supp. 3d at 182*; Pearl*, 546 F. Supp. 3d at 36.

Here, Plaintiffs have met their burden of proof under the lenient conditional certification standard. As explained herein, the Complaint, the declarations submitted with this memorandum, coupled with Defendant's uniform pay policies and Hourly Employees' position descriptions, satisfy the requisite burden of proof to certify a collective action and authorize notice. (*See generally,* **Exs. C – L**). More specifically, Plaintiffs have provided overwhelmingly sufficient evidence that conditional certification is warranted, as Plaintiffs have identified a common theory of Defendant's violations in terms of Defendant's failure to pay for Hourly Employees' time spent donning and doffing. The substantial allegations in Plaintiff's Complaint, supported by **Exhibits C – L**, demonstrate:

(1) Plaintiffs and all others similarly situated were employed by Defendant at its manufacturing facilities;

(2) Plaintiffs and all others similarly situated were paid an hourly rate;

(3) Plaintiffs and all others similarly situated were required to wear PPE during their work shifts;

(4) Plaintiffs and all others similarly situated spent substantial amounts of time each day donning and doffing PPE before and after their work shifts. Defendant, however, did not pay for all of this time. Instead, Defendant paid Plaintiffs and all others similarly situated based on their *scheduled* shift start times and end times (e.g. 6:00 p.m. to 6:00 a.m.), not the time that they performed their first and last principal activities of the workday.

(ECF No. 1, ¶¶ 132-139; *see also* **Exs. C - L**).

Accordingly, Plaintiff has identified both (1) that his job positions and duties are similar to those positions held by the putative class members, *Cunha*, 221 F. Supp. 3d at 182 ***and*** (2) that Plaintiff and all Hourly Employees members were all subject to the same unified policy, plan, or scheme that forms the basis of the alleged FLSA violation. *Trevzant,* 434 F.Supp.2d at 43. Plaintiffs have sufficiently demonstrated that conditional certification is warranted.

### c. At the Notice Stage, Courts Do Not Evaluate the Merits, Make Credibility Determinations or Consider Individual Defenses

In determining whether a group of similarly situated individuals exists, the Court does "not need to make any findings of fact with respect to contradictory evidence presented by the parties or make any credibility determinations with respect to the evidence presented." *Poreda*, 532 F. Supp. 2d at 249 (quoting *Trevzant,* 434 F.Supp.2d at 43). Furthermore, such determinations are reserved for the second tier of the process, after the completion of discovery, where the Court makes a final "similarly-situated" determination by examining a developed factual record. *Trevzant,* 434 F.Supp.2d at 42; *Torrezani,* 318 F.R.D. at 557; *Poreda*, 532 F. Supp. 2d at 241.

Similarly, allegations that the parties' claims or defenses are too individualized does not preclude conditional certification. *See Pearl*, 546 F. Supp. 3d at 36 ("[D]efendant's arguments with respect to the dissimilarity between job duties and exemption status are more appropriately

evaluated at the second stage of certification."); *Torrezani*, 318 F.R.D. at 557 (quoting *Prescott v. Prudential Ins. Co.*, 729 F.Supp.2d 357, 364–65 (D. Me. 2010)) (finding that the second stage of the analysis is where the court examines: "factual and employment settings of the individual[ ] plaintiffs, the different defenses to which the plaintiffs may be subject on an individual basis, [and] the degree of fairness and procedural impact of certifying the action as a collective action."); *Keller-Brittle v. Collecto Inc.*, 2018 WL 6199568, at *2 (D. Mass. Nov. 28, 2018) (the second step examines: "(1) the disparate factual and employment settings; (2) defenses that may be individual to each plaintiff; and (3) fairness and procedural considerations.").

### 2. *Early Notice Is Imperative to Protect Employees' Statutes of Limitations*

District courts recognize the great prejudice that befalls employees when notice of a collective action is not issued in a timely fashion. *See Keller-Brittle v. Collecto Inc.*, 2018 WL 6199568, at *3 (D. Mass. Nov. 28, 2018) ("Requests for conditional certification are frequently brought so that notice can be provided to as many prospective class members as possible before the statute of limitations nullifies their claims…Unlike Rule 23 actions in which 'filing a complaint tolls the statute of limitations for all alleged class members, whether they know of the lawsuit or not,' 'parties alleged to be 'similarly situated' in a § 216(b) case must affirmatively opt in to toll the limitations period.' This may allow defendants to 'bleed value out of a large pool of outstanding FLSA claims' if they successfully delay notice and thereby limit the number of plaintiffs who become aware of their potential claim before the limitations period expires.'" (internal citations omitted)); *Roberts v. TJX Companies, Inc.*, 2017 WL 1217114, at *8 (D. Mass. Mar. 31, 2017) (citing 29 U.S.C. § 256(b) ("The limitations period on claims of a potential opt-in plaintiff in a FLSA collective action is not tolled by the filing of a complaint, but instead continues to run until the putative plaintiff files a written consent to join the action."). These

decisions recognize that because most employees will not know about a collective action before receiving court-authorized notice, those employees cannot join the case until after that notice is sent and will have lost a large portion of their claim(s) by the time they do join.

The Supreme Court affirmed the importance of potential opt-in plaintiffs receiving timely notice of their potential claims:

> [N]otice to absent class members need not await a conclusive finding of similar situations. To impose such a requirement would condemn any large class claim . . . to a chicken-and-egg limbo in which the class could only notify all its members to gather together after it had gathered together all its members, and from which the class could escape only by refusing entry after some unpublicized cutoff date to additional class members who thereafter stumble upon the case by themselves.

*Sperling v. Hoffman-LaRoche, Inc.*, 118 F.R.D. 392, 406 (D.N.J. 1988).

When courts delay making a conditional certification determination, numerous FLSA violations may persist without redress due to nothing more than the running statute of limitations. Indeed, defendant employers could easily eliminate all FLSA exposure by simply running out the clock. Conversely, employees who lack meritorious claims or who are not ultimately found to be "similarly situated" to the named plaintiffs receive no structural advantage from early court facilitated notice. Employees still must prove their case on the merits, and they still must withstand a stage-two decertification analysis in order to proceed in the collective action. The only plausible purpose for delaying early notice is to foreclose the vindication of valid claims under the FLSA.

### 3. *Stage Two: The Certification/Decertification Stage*

The second stage of certification process "occurs after discovery is complete—at that time, the employer may then file a motion with the Court seeking de-certification." *Torrezani*, 318 F.R.D. at 557 (citing *Burns,* 881 F.Supp.2d at 234). There, based on a fully-developed record, the court makes an informed factual determination of whether the named plaintiffs and the opt-ins are

similarly situated. *Trezvant,* 434 F.Supp.2d at 42; *Torrezani,* 318 F.R.D. at 557. The plaintiff has

a heavier burden to show similarity at the second stage. *Pearl*, 546 F. Supp. 3d at 36.

### C.  <u>Plaintiffs' Proposed Notice Should be Approved</u>

Plaintiffs' proposed long-form Notice is attached as **Exhibit A**. Notice is a FLSA plaintiff's

communication with his co-workers, and, thus, "[a]bsent reasonable objections by either the

defendant or the Court, plaintiffs should be allowed to use the language of their choice in drafting

the notice." *Frykenberg v. Captain George's of South Carolina, LP*, 2020 WL 5757678, at *4

(D.S.C. Sept. 28, 2020); *see also Ivery v. RMH Fran. Corp.*, 280 F. Supp. 3d 1121, 1139 (N.D. Ill.

2017) ("[A]lthough the Court has both the power and the duty to ensure that the notice is fair and

accurate, that power should not be used to alter plaintiffs' proposed notice unless such alteration

is necessary."). Plaintiffs' proposed Notice was fashioned after notices that were approved in many

other FLSA collective actions.[11] Hence, this Court should approve Plaintiffs' proposed Notice and

permit Plaintiffs' counsel to circulate the Notice by U.S. Mail, email, and text message.

### D.  <u>Notice Should be Sent by Mail, Email, and Text</u>

Recognizing the reality of modern communication and its potential to advance the remedial

goals of the FLSA, numerous courts, including this Court and those in this Circuit, have found it

appropriate to distribute notice by way of e-mail in addition to mail. *See e.g.*, *Gardner v. Fallon*

*Health & Life Ins. Co., Inc.*, No. CV 4:19-40148-TSH, 2021 WL 4459525, at *4 (D. Mass. Sept.

29, 2021) (citing *Romero v. Clean Harbors Surface Rentals USA, Inc.*, 368 F. Supp. 3d 152, 163

(D. Mass*.), opinion clarified*, 404 F. Supp. 3d 529 (D. Mass. 2019); ("The Court will allow the

---

[11] *See e.g., Beattie v. TTEC Healthcare Sols., Inc.*, No. 1:18-CV-03098-RM-NRN, 2019 WL 2866559, at *2 (D. Colo. July 3, 2019); *Gaffers v. Kelly Servs.*, No. 16-cv-10128 (E.D. Mich. 2016); *Williams v. Sykes, et al.*, No. 13-cv-946 (D. Minn. 2013); *Stelmachers v. Maxim Healthcare Services, Inc.*, No. 13-cv-01062 (N.D. Ga. 2013); *Lawrence v. Maxim Healthcare Services, Inc.*, No. 12-cv-2600 (N.D. Ohio 2012).

plaintiffs to send the initial notice by mail, e-mail, and text message…Courts routinely allow notice by e-mail."); *Torrezani v. VIP Auto Detailing, Inc.*, 2017 WL 2951618, at \*2 (D. Mass. May 31, 2017); *Atkinson v. TeleTech Holdings, Inc.*, No. 3:14–cv–253, 2015 WL 853234, at \*5 (S.D. Ohio Feb. 26, 2015) (e-mail notice "appears to be in line with the current nationwide trend," and that "it advances the remedial purpose of the FLSA").

In addition, given the importance and urgency of providing notice to class members of a pending FLSA case, the Court should permit distribution of notice via text message. *See Gardner*, 2021 WL 4459525, at \*4; *Pogue¸* 2021 WL 5861184, at \*9 (finding "mail, email, and text message" as appropriate methods for notice distribution). Text message notice has been approved by numerous courts. *See Beattie*, 2019 WL 2866559, at \*2 (permitting plaintiffs to "provide notice by e-mail and text message as well as by regular mail"); *Bhumithanarn v. 22 Noodle Market Corp.*, 2015 WL 4240985, at \*5 (S.D.N.Y. July 13, 2015) (noting notice distribution via text message "is likely to be a viable and efficient means of communicating with many prospective members of this collective action."). A proposed Text Message Notice is attached as **Exhibit B**.

E. **This Court Should Grant a Sixty (60) Day Opt-in Period for Additional Plaintiffs to Join this Litigation And for Reminder Notice to Be Issued to Those Who Have Not Yet Responded**

Plaintiffs request that the Court approve a 60-day opt-in period and allow Plaintiffs to issue one reminder email thirty (30) days into the notice period to those who have not yet responded to the initial opt-in notice. Courts commonly approve reminders, particularly given the fact that the COVID-19 pandemic has created barriers to communication with collective members.[12]

---

[12] *See Gardner*, 2021 WL 4459525, at \*4; *Noll v. Flowers Food, Inc.*, 2017 WL 11516828, at \*2 (D. Mass. Jan. 20, 2017); *Robertson v. REP Processing, LLC*, 2021 WL 4255027, at \*4 (D. Colo. Sept. 16, 2021); *Pogue*, 2021 WL 5861184, at \*9.

IV.  **CONCLUSION**

For the reasons explained above, Plaintiffs respectfully request that the Court, pursuant to

Section 16(b) of the FLSA, 29 U.S.C. § 216(b), enter an order:

(1)  Conditionally certifying the proposed FLSA Collective;

(2)  Requiring Defendant to identify all putative collective members by providing a list of their names, last known addresses, dates and location of employment, phone numbers, and email addresses in electronic and importable format within ten (10) days of the entry of the order;

(3)  Authorizing Plaintiffs' proposed form of notice (**Exhibits A** & **B**) and implementing a procedure whereby the notice of Plaintiffs' FLSA claims is sent (via U.S. Mail, email, and text message) to:

*All current and former hourly employees who worked for Ken's Foods, Inc. at any of its manufacturing facilities during the last three years.*

(4)  Appointing the undersigned counsel as counsel for the FLSA Collective; and

(5)  Giving members of the FLSA Collective sixty (60) days to join this case, measured from the date the Court-approved Notice is sent, with one reminder email sent thirty (30) days thereafter to anyone who did not respond.


Dated:  July 29, 2024

Respectfully Submitted,
/s/ Kevin J. Stoops
Kevin J. Stoops (P64371)*
Jesse L. Young (P72614)*
Albert J. Asciutto (P82822)*
Sommers Schwartz, P.C.
One Towne Square
17th Floor
Southfield, Michigan 48076
(248) 355-0300
kstoops@sommerspc.com
jyoung@sommerspc.com
aasciutto@sommerspc.com
*pro hac vice motions submitted

Benjamin Knox Steffans (BBO# 568535)
Steffans Legal PLLC
10 Wendell Ave. Ext. Suite 208
Pittsfield, MA 01201
(413) 418-4176

bsteffans@steffanslegal.com
*Counsel for Plaintiff and the FLSA Collective*

## CERTIFICATE OF SERVICE

I certify that on July 29 2024, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record.

*/s/ Kevin J. Stoops*
kstoops@sommerspc.com

21