## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **DAVID AUSTIN, individually, and on behalf of all others similarly situated,**<br><br>　　　　*Plaintiffs*,<br><br>　　v.<br><br>**KEN'S FOODS, INC.,**<br><br>　　　　*Defendant.* | **Civil No. 4:24-cv-40040-MRG** |

### ORDER ON DEFENDANT'S PARTIAL MOTION TO DISMISS [ECF NO. 29]

**GUZMAN, D.J.**

### I.    INTRODUCTION

Plaintiff-employee David Austin brings this suit on behalf of himself and similarly situated putative class members (collectively, "Plaintiffs") against their employer, Defendant Ken's Foods ("Ken's), alleging that Ken's failed to pay Plaintiffs wages they were owed for time spent donning and doffing their uniforms on company premises. Plaintiffs bring claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq*. (Count I); the Massachusetts Fair Minimum Wage Law, Mass. Gen. Laws ch. 151, § 1A ("FMWL") (Count II); the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148 ("Wage Act") (Count III); and common law theories of breach of contract (Count IV) and unjust enrichment (Count V). [Compl., ECF No. 1]. Before the Court is Ken's Partial Motion to Dismiss Plaintiffs' state-law claims (Counts II-V) [ECF No. 29], where Defendant argues that such claims are preempted by the Labor Management Relations Act, 29 U.S.C. § 185(a) ("LMRA") and must be dismissed.

For the reasons stated below, the Court concludes that Plaintiffs' state-law claims are preempted by federal law. Accordingly, the Defendant's motion to dismiss is **<u>GRANTED</u>**.

## II.    <u>BACKGROUND</u>

### a.    <u>Procedural History</u>

Austin first filed a near-identical complaint in the Eastern Division of this Court on March 6, 2024, which he voluntarily dismissed on March 12, 2024. <u>See</u> <u>Austin v. Ken's Foods, Inc.</u>, No. 1:24-cv-10560-WGY (D. Mass. March 12, 2024). Austin then filed the operative complaint in this case in the Central Division on March 13, 2024. [Compl.] While Ken's moved to reassign the case back to the Eastern Division, alleging Plaintiffs were "judge shopping," the Court found credible Austin's explanation that he accidentally filed in the wrong division and denied the Defendant's motion. [ECF Nos. 8, 16, 17]. On May 13, 2024, Defendant filed the instant Partial Motion to Dismiss and accompanying brief. [ECF Nos. 29, 30]. On June 12, 2024, Plaintiffs timely filed an opposition to Defendant's motion. [ECF No. 38]. Defendant subsequently filed a reply brief on June 26, 2024. [ECF No. 44]. On December 11, 2024, Plaintiffs filed a supplemental memorandum in opposition, drawing the Court's attention to a memorandum Ken's issued to its employees at its Ken's Marlborough, MA manufacturing facility announcing new timekeeping policies relating to donning and doffing. [ECF No. 64]. Defendant filed a response to the supplemental memorandum on December 13, 2024 [ECF No. 65].

### b.    <u>Relevant Facts</u>

Defendant is a large manufacturer of more than 1,000 varieties of salad dressings and other sauces. [Compl. ¶ 2]. Plaintiffs are current and former hourly employees[1] who work(ed) at Ken's

---

[1] Hourly employee positions at Defendant's manufacturing facilities include, but are not limited to, employees holding the following positions: Forklift Operators, Machine Operators, Batch Processing Operators, Processing Supervisors, Mechanics, Sanitation employees, Team Leaders,

four manufacturing facilities, located in Marlborough, Massachusetts; Las Vegas, Nevada; McDonough, Georgia; and Lebanon, Indiana. [Id. ¶¶ 3–4, 14]. Ken's requires its manufacturing employees, including Plaintiffs to wear company-issued uniforms and personal protective equipment ("PPE") during their work shifts, both to comply with company policies as well as food-safety health regulations. [Id. ¶ 5]. Ken's required Plaintiffs to change into ("don") and change out of ("doff") the PPE before and after their work shifts at designated locations at Ken's manufacturing facilities, such as in employee locker rooms. [Id. ¶¶ 7, 10]. These activities took substantial time and involved "badging in" to the facility, retrieving or putting away uniforms, walking to and from the locker room to the production floor, donning and doffing more PPE, and walking out and "badging out" of the facility. [Id. ¶¶ 49, 53]. Ken's did not compensate Plaintiffs for the time it took them to don and doff, which they allege took between 10-12 minutes at both the start and end of their shifts. [Id. ¶¶ 11, 50]. Instead, Ken's only paid Plaintiffs based on their scheduled shift start and end times. [Id. ¶ 11].

Austin has been an hourly employee at Ken's facility in Marlborough, Massachusetts since 2011. [Id. ¶ 28]. Throughout his employment, Austin was part of a represented bargaining unit, the Ken's Foods Employee Union (the "Union"), and as such, various terms of his employment were governed by a collective bargaining agreement ("CBA").[2] [See ECF No. 30 at 2; see generally

_____

Distribution employees, Packaging Operators, Maintenance Planners, Maintenance Supervisors, Maintenance Technicians, Maintenance Foremen, Kitchen Mixers, Quality Control Technicians, Quality Assurance employees, Material Handlers, Safety Managers, Packaging Line Engineers, Production employees, and Production Supervisors. [Compl. ¶ 14].

[2] Plaintiff did not include the CBA as an exhibit to the complaint; however, "[t]he interrelationship of the state claims and a CBA cannot be avoided merely by refusing to identify the CBA in the complaint[.]" Cavallaro v. UMass Mem'l Healthcare, Inc., 678 F.3d 1, 5 (1st Cir. 2012) (considering a CBA where the CBA was invoked by defendants and plaintiffs did not dispute its existence). Additionally, the Court considers the CBA as it is incorporated by reference to Plaintiffs' claims in the complaint. See Newton Covenant Church v. Great Am. Ins. Co., 956 F.3d

CBA, ECF No. 30-1]. While the previous CBA between Ken's Foods and the Union was executed on November 1, 2021, and was in effect during the events alleged in the complaint, the current CBA became effective on November 1, 2024. [ECF No. 65 at 2].

The CBA, among other subjects, addresses many company policies, including base compensation for hourly employees (wages, hours, and overtime rates), rate of pay schedules based on employee titles, premium pay differentials for overtime, and grievance procedures.[3] [See ECF No. 30 at 3; CBA]. While the CBA has provisions on uniform requirements at the start and end of shift times, it is silent with respect to the compensability of donning and doffing time. [See CBA at 8, 43, 45, 54].

Plaintiff's supplemental filing included a memorandum issued by the Defendant on November 1, 2024, to its Marlborough Plant Employees, regarding timekeeping and PPE practices (the "Timeclock Memorandum"). [ECF No. 64 at 4]. The Timeclock Memorandum appears to address the issue of donning and doffing. [See id.] It provides notice to employees that they are expected to "change into their uniforms and PPE and report to their workstations **within 5 minutes** after the start of their scheduled shift," and at the end of the shift, employees must "change out of their uniforms and PPE and clock out **within 7 minutes** after their scheduled shift ends, unless otherwise **approved for overtime**." [ECF No. 64 at 4]. The Timeclock Memorandum states that

---

32, 35 (1st Cir. 2020) (citations omitted). Further, while Plaintiffs do not concede the Employee Handbook submitted as the CBA with Defendant's motion constitutes a bonified collective bargaining agreement [see ECF No. 38 at 6 n.2], they address it as such in responding to Defendant's motion. The Court shall do the same.

[3] See ECF No. 30 at 3, 8 n.7 (citing CBA at 52–56, 58, 95, 97–99) (highlighting the provisions of the CBA Ken's alleges are relevant to Plaintiffs' state law claims, including "Wages," "Work Week," "Special Work Rules," "Overtime," "Recording Work Hours," "Hourly Positions," "Grievance Procedure," and an attached exhibit listing employee titles along with corresponding wage rates for each employee.).

the updated policy came at the request of the Employee Council during "contract negotiations," and is part of changes to the locations of timeclocks in the facility to "facilitate smoother transitions between clocking in and out and changing into uniforms." [Id.]. In its response to Plaintiffs' supplemental filing, Ken's asserts that the Timeclock Memorandum reflects outcomes of its recent negotiation with the Union for the new November 1, 2024 CBA. [ECF No. 65 at 2]. Ken's points to the Memorandum as an indication that the issue of compensability of donning and doffing is exactly the type of dispute that union negotiations are meant to handle. [See id. at 3]. Ken's maintains its argument that resolving the Plaintiff's state-law claims will inevitably require interpretation the CBA, thereby preempting the claims under LMRA, which warrants the dismissal of those claims. [ECF No. 65 at 2]. For the following reasons, the Court agrees.

## III. <u>Legal Standards</u>

### A. Motion to Dismiss Standard

Dismissal under Rule 12(b)(6) is appropriate "if, after accepting all well-pleaded facts as true and drawing all reasonable inferences in favor of a plaintiff, the court determines that [the complaint] 'fails to state a claim upon which relief can be granted.'" <u>Doe v. Williston Northampton Sch.</u>, 766 F. Supp. 2d 310, 311–12 (D. Mass. 2011) (quoting <u>Edes v. Verizon Commc'ns, Inc.</u>, 417 F.3d 133, 137 (1st Cir. 2005)); Fed. R. Civ. P. 12(b)(6). A complaint must contain sufficient factual allegations to state a claim for relief that is "both actionable as a matter of law and 'plausible on its face.'" <u>Id.</u> (quoting <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009)); <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007). To survive a motion to dismiss, a complaint must set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." <u>Gagliardi v. Sullivan,</u> 513 F.3d 301, 305 (1st Cir. 2008) (citation omitted).

**B.  Section 301 of the LMRA**

Section 301 of the LMRA "not only provides federal-court jurisdiction over controversies involving collective-bargaining agreements, but also 'authorizes federal courts to fashion a body of federal law for the enforcement of these collective bargaining agreements.'" Lingle v. Norge Div. of Magic Chef, 486 U.S. 399, 403 (1988) (quoting Textile Workers v. Lincoln Mills, 353 U.S. 448, 451 (1957)); 29 U.S.C. § 185(a). The purpose of Section 301's preemption authority is to ensure uniformity in labor law across jurisdictions. See Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 210–11 (1985). In the interest of promoting a smooth resolution of labor-management disputes, the Supreme Court has held that Section 301 preempts state-law claims if resolution of the dispute requires the interpretation of a CBA. Lingle, 486 U.S. at 405–06, 413 (explaining that "if the resolution of a state-law claim depends on the meaning of a [CBA]," then the "state law is pre-empted and federal labor-law principles" must decide the matter); Caterpillar, Inc. v. Williams, 482 U.S. 386, 393 (1987). Specifically, Section 301 preempts state-law claims that are "substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract," where such claims are "inextricably intertwined with consideration of the terms of the labor contract," and more than "mere consultation" of the CBA is required to resolve the state-law claims. Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 220 (1985); Cavallaro, 678 F.3d at 7; Adames v. Exec. Airlines, Inc., 258 F.3d 7, 12 (1st Cir. 2001). Crucially, if "determining what (if anything) is owed" is an "inevitable issue" that would "depend[] at least arguably on interpretations and application of the CBA," then Section 301's preemptive authority will trigger. Cavallaro, 678 F.3d at 7-8 (citing Flibotte v. Pa. Truck Lines, 131 F.3d 21, 26 (1st Cir. 1997)).

On the other hand, a state-law claim escapes Section 301's preemptive sweep when the claims can be resolved independently of the CBA. See Lingle, 486 U.S. at 407, 413 (holding that

a state law claim, which partly relies on interpreting a CBA but also involves a separate and distinct state law analysis, may survive Section 301's preemptive authority); Allis-Chalmers Corp., 471 U.S. at 211 (noting, "not every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is pre-empted by § 301."). "State laws that establish substantive rights, obligations, or prohibitions independent of any labor contract do not implicate the same sort of federal questions" requiring application of uniform federal law as disputes regarding what parties agreed to in a labor agreement. Rose v. RTN Fed. Credit Union, 1 F.4th 56, 61 (1st Cir. 2021) (citing Allis-Chalmers Corp, 471 U.S. at 211).

In determining whether a state-law claim is preempted, the key question is the level at which the Court must consider the CBA in resolving the claim. If more than "mere consultation" of the of the CBA is required to resolve the state-law claim, i.e. consideration of the CBA is "substantial," "inextricably intertwined," or "inevitable," then the LMRA will preempt the state-law claims. Allis-Chalmers Corp., 471 U.S. at 220, 213; Cavallaro, 678 F.3d at 7–8. If the meaning of the CBA terms is not disputed, "the bare fact that a [CBA] will be consulted . . . does not require the claim to be extinguished" under Section 301.[4] Livadas v. Bradshaw, 512 U.S. 107, 124 (1994) (holding that where there is no factual dispute about "the amount of the penalty" owed to the employee, and the case can be resolved by simply consulting a calendar rather than the CBA, the claim survives Section 301 preemption). However, the First Circuit has stated that if a state-law

---

[4] See Lingle v. Norge Div. of Magic Chef, 486 U.S. 399, 413 n.12 (1988) (internal citations omitted):

> A collective-bargaining agreement may, of course, contain information such as rate of pay . . . that might be helpful in determining the damages to which a worker prevailing in a state-law suit is entitled. Although federal law would govern the interpretation of the agreement to determine the proper damages, the underlying state-law claim, not otherwise pre-empted, would stand.

claim "hinges upon" or "plausibly requires interpretation of one or more provisions of a CBA, it comes within the LMRA's preemptive sweep." Rose v. RTN Fed. Credit Union, 1 F.4th 56, 61 (1st Cir. 2021); Adames v. Exec. Airlines, Inc., 258 F.3d 7, 11–12 (1st Cir. 2001). Nevertheless, the First Circuit has acknowledged that this is a "fact-sensitive" analysis and "[t]he border between interpretation and bare consultation" is "hazy" and "difficult to plot." Rose, 1 F.4th 56, 61–63 (1st Cir. 2021) (internal citations omitted).

## IV.    **Application**

In its memorandum in support of its motion, Ken's argues that Plaintiffs' state-law claims for unpaid wages and overtime are based on rights derived from the CBA and that resolving the claims will inevitably require interpretation of the CBA to determine Plaintiff's entitlement to certain wages, overtime, and calculation of any compensable time owed. [ECF No. 30 at 50]. As a result, Ken's asserts that the state-law claims are preempted under the LMRA, and, therefore, must be dismissed. [Id.]

Plaintiffs' state-law claims assert statutory and common law causes of action for unpaid wages and overtime, specifically for time worked "off the clock," including pre-shift time obtaining and donning PPE, and post-shift time doffing and returning PPE. [Compl. ¶¶ 7–12, 17, 51–52, 55–56]. Plaintiffs submit that their claims are based on rights guaranteed by state law rather than the CBA, and as such, interpretation of the CBA is not required. [ECF No. 38 at 7–11]. While Plaintiffs admit that provisions of the CBA may relate to calculation of their damages and "would need to be consulted to confirm [the CBA] does not discuss" donning and doffing, they argue that this mere consultation does not mandate preemption. [Id. at 7]. Should the Plaintiffs prevail, rather than relying on the CBA to determine these rates, Austin submits an earnings statement as proof

of his hours worked and his regular and overtime pay rates.[ECF No. 1-1 at 2]. The Court infers that the same method of calculation could be used for the other putative class members' claims.

## A. Plaintiffs' State-Law Claims

Plaintiffs bring state-law claims under the Massachusetts Fair Minimum Wage Law, Mass. Gen. Laws. ch. 151, § 1A ("FMWL") (Count II), the Massachusetts Wage Act, Mass. Gen. Laws. ch. 149 § 148 ("Wage Act") (Count III), and common law breach of contract (Count IV) and unjust enrichment (Count V) (Counts II—V, collectively, the "state-law claims").

### i. Unpaid Overtime Wages under the Massachusetts Fair Minimum Wage Law

Massachusetts state law provides a right to overtime compensation pursuant to Mass. Gen. Laws ch. 151, § 1A, also known as the Fair Minimum Wage Law ("FMWL"). This statute mirrors its counterpart in the FLSA,[5] providing that employers must pay time-and-a-half for hours worked in excess of forty (40) per week. See 29 U.S.C. § 207. To establish a claim for unpaid overtime under the FMWL,[6] the plaintiff-employee must show "both that he incurred unpaid overtime work, and that the employer had actual or constructive knowledge that he was working overtime." See e.g., Gendron v. Kinjawi, No. 1:22-cv-11910-JEK, 2025 U.S. Dist. LEXIS 33470, at *25 (D. Mass. Feb. 25, 2025) (citing Vitali, 36 N.E.3d at 69). Of particular note

---

[5] See e.g., Valerio v. Putnam Assocs., Inc., 173 F.3d 35, 40 (1st Cir. 1999) ("The basic overtime provision of the Massachusetts statute is essentially identical to the FLSA"); Mullally v. Waste Mgmt. of Mass., 895 N.E.2d 1277, 1281 (Mass. 2008); Swift v. Autozone, Inc., 806 N.E.2d 95, 98-99 (Mass. 2004). While the FLSA creates "a national floor under which wage protections cannot drop," it does not prohibit states from enacting more beneficial labor laws. See also Gibel v. Iron Cumberland, LLC, No. 23-2050, 2024 U.S. Dist. LEXIS 140805, at *6 (W.D. Pa. Aug. 7, 2024).

[6] A claim for unpaid overtime wages under the FLSA is identical to the FMWL, and Massachusetts courts applying the FMWL look to how the FLSA has been construed. Vitali v. Reit Mgmt. & Research, LLC, 36 N.E.3d 64, 69 (Mass. App. Ct. 2015); 29 U.S.C. § 207(a)(1); Manning v. Bos. Med. Ctr. Corp., 725 F.3d 34, 43 (1st Cir. 2013).

to the matter at hand, in some circumstances, employers may credit premium payments already made to an employee toward overtime payments owed under the FWML. M.G.L. ch. 151, § 1A; see Swift v. Autozone, Inc., 806 N.E.2d 95 (Mass. 2004).

### ii.  Unpaid Wages under the Massachusetts Wage Act

Section 148 of the Massachusetts Wage Act, which also mirrors the FLSA,[7] mandates that every employer shall pay each employee their "wages earned" within a fixed period of days after the end of a pay period.  Mass. Gen. Laws ch. 149 ("Wage Act"), § 148. While the statute does not itself define "earn," the Supreme Judicial Court of Massachusetts ("SJC") has adopted the "plain and ordinary meaning" of the term. Awuah v. Coverall N. Am., Inc., 952 N.E.2d 890, 896 (Mass. 2011) (noting the plain and ordinary meaning of "earn" is "[t]o acquire by labor, service, or performance," or "[t]o do something that entitles one to a reward or result, whether it is received or not." (quoting Black's Law Dictionary 584 (9th ed. 2009)). Accordingly, "[w]here an employee has completed the labor, service, or performance required of him, therefore, according to common parlance and understanding he has 'earned' his wage." Id.

The Massachusetts Department of Labor Standards expands on these concepts through regulations. See 454 C.M.R 27.02. The regulations define "Regular Hourly Rate" as "[t]he amount that an employee is regularly paid for each hour of work." Id. The regulations define "Working Time" as including "all time during which an employee is required to be on the employer's premises or to be on duty, or to be at the prescribed work site or at any other location, and any time worked before or after the end of the normal shift to complete the work. . . .[(excluding meal times)]." Id. Further, Section 148 also stipulates that "[n]o person shall by a special contract with

---

[7] The FLSA requires employers to compensate employees for "all hours worked." Integrity Staffing Sols., Inc. v. Busk, 574 U.S. 27, 31 (2014) (internal citations omitted); Montoya v. CRST Expedited, Inc., 88 F.4th 309, 320 (1st Cir. 2023); see 29 U.S.C. § 201–219.

an employee or by any other means exempt himself from" the protections enumerated in the statute. Wage Act § 148.

To establish a claim for unpaid wages under the Wage Act, a plaintiff must prove three elements: (1) the plaintiff was an employee [of defendant-employer] under the Wage Act; (2) the compensation constitutes wages pursuant to Act; and (3) the defendant's violated the Wage Act by not paying the wages owed in a timely manner. Chun Lin Jiang v. Kobe Japanese Steakhouse, Inc., No. 22-11867-FDS, 2024 U.S. Dist. LEXIS 212958, at *11 (D. Mass. Nov. 22, 2024) (citing Stanton v. Lighthouse Fin. Servs., 621 F. Supp. 2d 5, 10 (D. Mass. 2009)).

### iii.  Discussion of Wage and Overtime Acts

As stated above, the primary question before the Court is whether, in *resolving* Plaintiff's state-law claims, the CBA terms are so "inextricably intertwined" with this Court's analysis that determining the amounts owed for unpaid wages and overtime "inevitably" requires the Court to interpret the CBA, thus placing the state-law claims within the preemptive scope of the LMRA. E.g., Allis-Chalmers Corp., 471 U.S. at 213; Rose, 1 F.4th at 61; Cavallaro, 678 F.3d at 7–8; see Livadas, 512 U.S. at 124. As discussed below, the Court finds that the LMRA preempts Plaintiffs' claims under the FMWL and the Wage Act because substantial interpretation of the CBA is required to determine what amounts Plaintiffs would be entitled to recover under those laws. This conclusion is well-supported by First Circuit case law.

In Cavallaro v. UMass Mem'l Healthcare, Inc., the First Circuit held that hospital employees' Wage Act claims were preempted by the LMRA because determining the amount of wages owed under the statute would require interpretation of wage and benefit structures contained in the CBA. 678 F.3d at 7-9; [ECF No. 30 at 5-6]. The plaintiffs in Cavallaro sought compensation for pre-and post-shift work, meal breaks and training sessions, at wages "calculated at applicable

premium rate." Cavallaro v. UMass Memorial Health Care, Inc. ("Cavallaro I"), No. 4:09-cv-
40181-FDS (D. Mass. May 16, 2011) (Compl. ¶¶ 92, 95, 99, ECF No. 1-2). The First Circuit
concluded that issues like premium pay above the state-mandated minimum, differential pay for
certain shifts, and whether certain meal breaks and training sessions were compensable "require[d]
construing and applying the various 'peculiarities of industry-specific wage and benefit structures'
embodied in the CBA" to assess wages owed. Cavallaro, 678 F.3d at 8 (quoting Adames, 258 F.3d
at 13). These issues were critical to determining relief for the plaintiffs because "additional
compensation provided by the CBA—say, premium pay above state mandatory rate, or differential
pay for certain shifts—may offset any deficiency created by other uncompensated time for
purposes of satisfying state minima." Cavallaro, 678 F.3d at 8. As a result, the court concluded that
"determining what (if anything) is owed" was an "inevitable issue" and would "depend[] at least
arguably on interpretations and application of the CBA." Id. (citing Flibotte v. Pa. Truck Lines,
131 F.3d 21, 26 (1st Cir. 1997)). Accordingly, the court found plaintiffs' Wage Act claim was
preempted by the LMRA. Cavallaro, 678 F.3d at 8. The court did not decide whether the LMRA
preempted plaintiffs' FMWL claim because that claim was barred under an FLSA exception that
prohibits hospital employees from relief. Id. at 9 (citing Adames, 258 F.3d at 14–15); Mass. Gen.
Laws ch. 151, §1A (16).

    Similarly, in Rose v. RTN Fed. Credit Union, the First Circuit affirmed the district court's
ruling that a plaintiff's state-law claims for unpaid wages and overtime were preempted by Section
301 because interpretation of the CBA "seem[ed] unavoidable" in order to determine what amount
of wages plaintiff would be owed. 1 F.4th at 62. The plaintiff's claims arose from her employer's
requirement that she periodically report to a separate location that added approximately two hours
total to her usual commute. Id. at 59. The plaintiff ("Rose") brought claims for unpaid wages and

overtime based on a Massachusetts labor regulation which "stipulates that an employee who 'regularly works at a fixed location' must be compensated for the extra time and expense involved in traveling to a location other than her 'regular work site.'" Id. (quoting 454 CMR 27.04(4)(b)). Notably, Rose challenged which "blocs of her time were compensable under the CBA, and at what rate." Rose, 1 F.4th at 63. Not only did the court find that Rose's claims required interpretation of a specific "temporary transfer" provision in the CBA, but it also concluded that adjudicating her claim will "require construing and applying the various 'peculiarities of industry-specific wage and benefit structures' embodied in the CBA." Id. at 62 (quoting Cavallaro, 678 F.3d at 8 (quoting Adames, 258 F.3d at 13)). The court reasoned, "[g]iven that the CBA adds qualifications to wage rates in light of a variety of factors and also adds qualifications to when and how overtime is to be computed, the need for such interpretations seems unavoidable." Rose, 1 F.4th at 62 Accordingly, "[p]rovisions [of the CBA] such as those governing 'hours of work,' 'premium time,' 'overtime,' and 'classification and wages' [would] have to be analyzed." Id.

The Plaintiffs here advance similar arguments to Rose, and these arguments fail for the same reasons. See id. at 63 ("Rose tries to frame these questions as susceptible to straightforward resolution, suggesting (for example) that determining the overtime compensation due to her would require no more than multiplying her extra commuting time by time-and-one-half at her regular rate of pay"). Like in Rose, in submitting an earnings statement in place of the CBA, Plaintiffs assert that calculating what time they are owed under the statute would be a simple exercise of referencing one of their earnings statements to see what their regular rate is and how many hours they worked in a week, and if the particular individual worked more than forty (40) hours in a week, the additional 20-24 minutes a day they allege they are owed would be compensated at one-and-a-half times their regular rate. [See Compl. ¶¶ 82, 150]. Plaintiffs fail to consider that

Massachusetts wage laws contemplate "offsets" where employers may credit some forms of premium pay they have already paid to the employee against any overtime compensation the employer owes. See Cavallaro, 678 F.3d at 8 n.9 ("Massachusetts wage and hour statutes incorporate the standards of the Fair Labor Standards Act, which contemplates such offsets."); see 29 U.S.C. § 207(e)(5)-(7), (h); 29 C.F.R. § 778.200, 778.202; Mullally v. Waste Mgmt. of Mass., 895 N.E.2d 1277, 1281 (Mass. 2008). For example, under the FLSA, if an employee receives payment of premium rates due to a labor agreement, such as for work in excess of eight (8) hours a day or forty (40) hours per week, "the extra compensation provided by such premium rates, paid for excessive hours, is a true overtime premium to be excluded from the regular rate and it may be credited toward overtime compensation due under the Act." 29 C.F.R. § 778.202(b). To illustrate this significance of these offsets, the Court need only to look at Austin's earnings statement and attempt to calculate what relief would be owed.

Using Austin's earning statement to calculate what amount he might be owed (should he prevail on his state-law claims) is impossible without substantial interpretation of terms in the CBA. The statement shows he worked 48.25 hours in a week, with his "Regular" rate listed as $38.00/hour and his "Overtime" rate listed as $57.00/hour. [ECF No. 1-1]. Simple enough, so far. The problem arises when considering what amount of time would constitute overtime. Austin's earnings statement shows he worked 32.00 hours at his regular rate – below forty (40) hours – but he still earned both overtime and "dbletime" compensation anyway. [See ECF No. 1-1]. If the Court were to grant the relief sought and allow recovery of the 20-24 minutes per shift that Plaintiffs seek, should that time be compensated at the "regular rate" or the "overtime rate"? Why was Austin paid a premium rate when he worked under forty (40) hours at his regular rate? The FMWL and Wage Act provide no guidance here as they only stipulate that overtime wages are

owed when an employee works more than forty (40) hours in a workweek at their regular rate. The answers to these questions lie in the CBA.

Consider the provision in the CBA titled, "Work Week." [CBA at 53]. The provision defines "regular workweek" as encompassing forty (40) hours over four or five days and that "[a]ll work performed over and above (40) hours per week shall be paid for at time and one half the regular hourly rate." [Id.] Further, "[a]ny work performed over and above sixty (60) hours per week shall be paid for at double time." [Id.] Additionally, the CBA authorizes premium pay of time-and-one-half for hours worked over eight (8) hours in any one day for a five-day workweek, or ten (10) hours in a day for a four-day workweek. [Id.] Special pay rates are also authorized for specific types of work, such as "Maintenance." [Id.] Why Austin received premium pay before hitting forty (40) hours at regular pay during his workweek will require interpreting these provisions in the CBA as applied to him. Just as the First Circuit reasoned in Rose, "[g]iven that the CBA adds qualifications to wage rates in light of a variety of factors and also adds qualifications to when and how overtime is to be computed, the need for such interpretations seems unavoidable." Rose, 1 F.4th at 62. This conclusion is true even if Plaintiffs' claims derive from rights secured by state law rather than the CBA due to the state and federal labor laws' offset provisions. Moreover, although the CBA itself is silent as to donning and doffing, the Court would still need to interpret the CBA provisions above to resolve Plaintiffs' claims.

In holding that the so-called "Sunday Law,"[8] allowed employers to "credit" overtime already paid against the time-and-a-half recovery for uncompensated overtime work done on

---

[8] Until 2023, Mass. Gen. Laws ch. 136, § 6 (50), also known as the "Sunday Law," required that most retail operators in the state pay employees time-and-one-half for hours worked on Sundays. This requirement was repealed with the 2018 amendment to the statute that took effect January 1, 2023.

Sundays, the SJC noted the Massachusetts Legislature did not intend the Sunday Law and the FMWL to provide "double" overtime payment. <u>Swift</u>, 806 N.E.2d at 100 ("There is nothing in the legislative history to suggest that the Massachusetts Legislature intended to provide more generous overtime or premium rate compensation than Federal law"). If the Court were to proceed as Austin suggests and simply consider that the total number of hours he worked in excess of forty (40) hours in the week, then allow recovery of the 20-24 minutes at the overtime rate, it would, at least in part, be granting Austin double overtime. While <u>Swift</u> concerned the Sunday Law specifically, the FLSA explicitly permits crediting of premium pay to offset employer obligations to pay overtime under the law, and Massachusetts wage and hour laws, including the two statutory schemes at issue here, incorporate the standards of the FLSA regulations. <u>See Cavallaro</u>, 678 F.3d at 8 n.9. Accordingly, because the Court is unable to resolve Plaintiffs' claims without substantially interpreting terms in the CBA, Section 301 of the LMRA preempts Plaintiff's state-law claims under the FMWL and the Wage Act. As a result, Counts II and III are **<u>DISMISSED</u>**.

### iv. Breach of Contract

"To state a claim for breach of contract, a plaintiff must allege the existence of a valid contract, the defendant's breach of contract, and damages that resulted from the defendant's breach." <u>Rooney v. Leerink Partners, LLC</u>, Civil Action No. 1:24-CV-11165-AK, 2025 U.S. Dist. LEXIS 21501, at *25 (D. Mass. Feb. 6, 2025) (citing <u>Stagikas v. Saxon Mortg. Servs.</u>, 795 F. Supp. 2d 129, 136 (D. Mass. 2011)). In a breach of contract claim for a labor dispute involving a CBA, if interpretation of a plaintiff's employment contract requires interpretation of the CBA, the breach of contract claim is preempted by the LMRA. <u>Fiumara v. President & Fellows of Harvard Coll.</u>, 526 F. Supp. 2d 150, 159 (D. Mass. 2007).

Plaintiffs fail to establish that they had an enforceable employment contract with the Defendant. If Plaintiffs conceded their employment contract with Ken's was encompassed in the CBA, their breach of contract claim would likely be dismissed as preempted by the LMRA. See id. As an alternative to the CBA, Plaintiffs allege nebulous "contractual promises to pay Plaintiffs their applicable hourly rate for each hour worked and their overtime rate for overtime hours." [Compl. ¶ 82]. Plaintiffs assert that this purported employment agreement "is evidenced by, among other things, earnings statement[s] issued to the Plaintiffs." [Id.] Upon reviewing Austin's earnings statement, [ECF No. 1-1], the Court finds that the document does not constitute an enforceable employment contract. Plainly, the earnings statement fails to include any information about the material terms of Plaintiffs' employment with Ken's. See Situation Mgmt. Sys., Inc. v. Malouf, Inc., 724 N.E.2d 699, 703 (Mass. 2000) ("It is axiomatic that to create an enforceable contract, there must be an agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by the agreement . . ."). Take, for example, the terms of Plaintiffs' compensation. Under the "Earnings" section of the earnings statement, Austin received eight different classifications of payment, including "regular," "overtime," "Dbletime," and "EVE SHFT." [ECF No. 1-1]. The fact that Plaintiffs receive varying types of pay at different rates indicates that somewhere, in another actual employment agreement, exists the material terms of the circumstances dictating when Plaintiffs receive which type of pay. [See id.] Further, the earnings statement does not indicate Plaintiffs' titles, job duties, or duration of employment. [See id.] The earnings statements do not create an enforceable employment contract due to the absence of these terms. See Ferrera v. Carpionato Corp., 895 F.2d 818, 822 (1st Cir. 1990) ("The essential terms of an employment contract are the parties to the contract, the position to be assumed, the salary or compensation to be received and the duration." (citation omitted)).

Although Plaintiffs say that their "contract" with Ken's can be evidence by "other things," they have failed to put forth any alternative contract than what the earnings statement shows. [See Compl. ¶ 82]. The Court is not blind to the reality that Plaintiffs in the Marlborough Plant, such as Austin, are covered by the CBA – which does include those essential terms outlined above. [See CBA]. Other courts in this District have found that failure to allege any contract other than a CBA in a breach of employment contract case is grounds for preemption. See Fiumara, 526 F. Supp. 2d at 159 (because the plaintiff was an employee subject to a CBA and failed to identify any contract other than the CBA in either his complaint or opposition briefs, the Court was required to interpret the CBA). While Plaintiffs did not include the CBA in their complaint, they refer to it in their opposition briefs to oppose Defendant's motion. [ECF No. 38 at 6 n.2]. Still, Plaintiffs decision to omit the CBA from the complaint constrains the Court's analysis.

In Cavicchi, another session of this Court denied a partial motion to dismiss a breach of contract employment claim based on procedural limitations on what materials the court could consider in deciding the motion. Cavicchi v. Raytheon Co., 16 F. Supp. 3d 4, 8–9 (D. Mass. 2014). The court in Cavicchi noted it was bound to accept all well-pled statements in the complaint as true on a motion to dismiss, and that plaintiff's submission that he had an "employment contract under which he can only be terminated 'for cause'" coupled with both parties' failure to provide a copy of the CBA to the court, required the motion to be denied so the court could consult the CBA to see if the claim was preempted. Id. This case is unlike Cavicchi because in Cavicchi the court did not have any copy of the CBA produced by either party and the plaintiff alleged an employment contract with an actual material term that was specific (that he could be terminated only "for cause"). Here, Plaintiffs have failed to allege any materials terms for their indistinguishable "contractual promises" as described above and have put forth no alternative employment contract

other than the CBA. [See Compl. ¶ 82]. Nevertheless, in light of <u>Cavicchi</u>, and out of deference to Plaintiffs' privileges on a motion to dismiss, the Court declines to reach the merits of whether the LMRA preempts the Plaintiffs breach of contract claim due to interpretation of the CBA. Instead, the Court finds Plaintiffs have failed to state a claim upon which relief can be granted because they have not alleged any enforceable employment contract between themselves and the Defendant. Accordingly, Count IV is **<u>DISMISSED</u>**.

### v.  Unjust Enrichment

"To succeed on a claim of unjust enrichment, a plaintiff must show that (1) they conferred a benefit on the defendants; (2) the defendants had an appreciation or knowledge of that benefit; and (3) under the circumstances, the defendants' acceptance or retention of the benefit would be inequitable without payment for its value." <u>Rooney v. Leerink Partners, LLC</u>, No. 1:24-CV-11165-AK, 2025 U.S. Dist. LEXIS 21501, at *28 (D. Mass. Feb. 6, 2025). Like with a breach of contract claim for an employee bound by a CBA, if an employee covered by a CBA brings a claim for unjust enrichment that requires interpretation of the CBA, such claim is preempted. <u>Cavallaro</u>, 678 F.3d at 8 (quoting <u>Adames</u>, 258 F.3d at 13). However, when a plaintiff's claim for unjust enrichment depends purely on benefits conferred to them by state law, interpretation of a CBA may not be required. <u>Hernandez v. Harvard Univ.</u>, No. 12-11978-DPW, 2013 U.S. Dist. LEXIS 46889, at *8 (D. Mass. Mar. 28, 2013).

In <u>Hernandez</u>, another session of this Court found that employee-plaintiffs' unjust enrichment claim was not completely preempted because liability for the claim was derivative of liability for plaintiffs' claims under the Massachusetts Tips Law. <u>Id.</u> at *6–11. The plaintiffs in <u>Hernandez</u> were wait staff employees at defendant's food establishment. <u>Id.</u> at *1. For the duration of their employment, plaintiffs operated under a CBA between them and their hourly rate of pay

were governed by the agreement. Id. Plaintiffs alleged that they were told by defendant not to retain any money left as tip by patrons. Id. The named plaintiff alleged that the Massachusetts Tips Law prohibits defendant-employer for retaining any service charges and tips that were nevertheless left by patrons. Id. The defendant in Hernandez raised the same arguments as Ken's in asserting that the defensive preemption under LMRA for plaintiffs' state law claims, namely that resolving plaintiffs' claims would rely on or require interpretation of the CBA. Id. at *6 (citing Flibotte v. Pennsylvania Truck Lines, 131 F.3d 21, 26 (1st Cir. 1997). Notably, the CBA in Hernandez was silent on gratuities, leading the court to conclude that plaintiffs' claims were not founded on rights created by the CBA. Id. at *4–6. In the context of plaintiff's unjust enrichment claim, the defendant argued that CBA interpretation was required to determine whether the retention of tips violated any agreed-upon terms in the CBA, which guaranteed wages in excess of Massachusetts Statutory minima. Id. at *6. However, the defendant failed to identify any provisions of the CBA that the court would need to interpret. Id. at *8. There was no dispute about the wages owed to plaintiffs under the CBA. Id. Instead, the Hernandez plaintiffs only sought amounts owed in the form of gratuities, which the Court found were "a form of compensation wholly extraneous to the CBA." Id. at *8. As a result, the Hernandez court concluded that the governing CBA need only be "consulted" to establish the compensation it guarantees plaintiffs. Id. at *10 ("given that plaintiff's unjust enrichment claim is on its face derivative of liability under the Tips Law, which cannot plausibly be said to depend on CBA interpretation, the claim is not completely preempted."). The court in Hernandez was careful to distinguish its case from Cavallaro, noting that Cavallaro did involve a dispute about the amounts owed and the "intricacies of the CBA governing [the plaintiffs'] employment." Id. at *6 (citing Cavallaro, 678 F.3d at 8).

This case is more similar to <u>Cavallaro</u> than <u>Hernandez</u> and the same result should follow. Although Plaintiffs, like the plaintiffs in <u>Hernandez</u>, assert that their claims derive from rights endowed by state law, unlike the <u>Hernandez</u> plaintiffs, Plaintiffs here are seeking overtime compensation if any individual plaintiff worked more than forty (40) hours in the week. [<u>See</u> Compl. ¶ 17]. As stated above, to figure out what amount might be owed will depend on analyzing provisions of the CBA governing the work week and premium pay. The last element of an unjust enrichment claim involves establishing the value of the benefit conferred. <u>Rooney</u>, 2025 U.S. Dist. LEXIS 21501, at *28. The First Circuit has held that "a party claiming unjust enrichment in Massachusetts must present evidence as to the amount of the unjust enrichment." <u>Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.</u>, 552 F.3d 47, 63 (1st Cir. 2009) (citing <u>Incase, Inc. v. Timex, Corp.</u>, 488 F.3d 46, 54–55 (1st Cir. 2007)). As with Plaintiffs' claims under the Wage Act and FMWL, interpretation of the CBA is "inevitable" to determine what Plaintiffs might be owed. <u>See</u> <u>Cavallaro</u>, 678 F.3d at 8. Further, the First Circuit in <u>Cavallaro</u> stipulated that claims for unjust enrichment where plaintiffs assert they "have not been paid the wages they are owed," "necessarily depend upon analysis of the CBA's terms." <u>Id.</u> at 5–6 (finding the LMRA preempts plaintiffs' unjust enrichment claim). Accordingly, Section 301 of the LMRA preempts Plaintiffs' claim for unjust enrichment and Count V is hereby **DISMISSED**.

## B.  The Arbitration Provision of the CBA

As the Court has already granted the Defendant's partial motion to dismiss in full, it declines to reach the merits of whether the CBA's arbitration provision would require dismissal of Plaintiff's state-law claims. Ken's motion only sought to dismiss Plaintiffs' state-law claims, and so consideration of whether the arbitration clause would impact Plaintiffs' FLSA claim is not before the Court.

**C.  The Statute of Limitations on Plaintiffs' Claims Limits Their Recovery**

The FLSA provides that a claim for unpaid wages and overtime brought under the federal act is subject to a two-year statute of limitations period, unless the claim arises from "a willful violation," in which case a three-year statute of limitations applies. 29 U.S.C. § 255(a); Devaney v. Zucchini Gold, LLC, 184 N.E.3d 1248, 1256 (Mass., 2022); see Anderson v. Sara Lee Corp., 508 F.3d 181, 192 (4th Cir 2007) (emphasizing the "basic assumption that Congress [does] not intend to displace state law"). Ken's contests that its conduct does not amount to "willful" conduct. [ECF No. 30 at 10]. Whether or not any violation of the FLSA was done willfully is premature to consider at the motion to dismiss stage before factual development from discovery has occurred. For now, the Court will apply the larger three-year statute of limitations and confine Plaintiffs' recovery on Count I to conduct occurring after March 6, 2021. See Stone v. Ruiz, No. CIVA 07-12327 PBS, 2008 WL 2817101, at *1 (D. Mass. July 18, 2008) (limiting claims to the applicable statute of limitations period on a motion to dismiss).

**D.  CONCLUSION**

For the forgoing reasons, Defendant's Partial Motion to Dismiss is **GRANTED**. Counts II-V of the complaint are hereby **DISMISSED**.


**SO ORDERED.**

Dated: March 21, 2025

     /s/ Margaret R. Guzman
     Margaret R. Guzman
     United States District Judge